# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

                                                    Case No. 19-cr-322 (JRT/TNL)

                        Plaintiff,

v.                                                  **REPORT & RECOMMENDATION**

Demetrice Devon Miller,

                        Defendant.

---

Benjamin Bejar, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Douglas Olson, Assistant Federal Defender, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

---

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Demetrice Devon Miller's Motion to Suppress Statements, Admissions, and Answers, ECF No. 24.[1] This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on January 28, 2020. ECF No. 28. Assistant United States Attorney Benjamin Bejar appeared on behalf of the United States of America (the

---

[1] At the hearing, Defendant orally moved to amend his motion to include statements from November 23, 2019. ECF No. 28. The request was granted. ECF No. 28.

"Government").    Assistant Federal Defender Douglas Olson appeared on behalf of Defendant.    Post-hearing briefing is now complete, and this motion is ripe for a determination by the Court.[2]

## II. FINDINGS

The Court heard testimony from Officer Sean Higgins and Sergeant Thomas Arnold, both with the St. Paul Police Department.  The Government offered and the Court received: Exhibit 1, a *Miranda* rights form, dated November 25, 2019, for an interview with Defendant, signed by Sergeant Arnold, but not Defendant; Exhibit 2, an audio recording of Sergeant Arnold's interview with Defendant on November 25, 2019; Exhibit 3, an audio recording of Sergeant Arnold's interview with Defendant on November 26, 2019; Exhibit 4, video footage from Officer Higgins's body-worn camera on November 23, 2019; Exhibit 5, a still from that video; Exhibits 6 and 7, photos from the scene of Defendant's arrest; and Exhibit 8, a map of the area of the traffic stop.  Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned makes the following findings.

### A.  November 23 Traffic Stop & Defendant's Arrest

Officer Higgins has been employed with the St. Paul Police Department since 2018.  Tr. 3:22-25, ECF No. 31.[3]  Officer Higgins's primary responsibilities include patrolling an

---

[2] This Report & Recommendation is being issued following a series of General Orders issued by Chief Judge Tunheim in connection with the COVID-19 pandemic, *available at* https://www.mnd.uscourts.gov/coronavirus-covid-19-guidance.

[3] The Court notes that the period of time for requesting redaction has expired and neither party requested that the hearing transcript be redacted.  ECF Nos. 31, 32.  *See* D. Minn. LR 5.5.

assigned area, responding to emergency calls, and investigating criminal activity.  Tr. 4:7-11; *see* Tr. 28:2-4.

On November 23, 2019, Officer Higgins and his partner were patrolling an area of St. Paul, Minnesota.  Tr. 4:23-5:12, 27:24-28:1.  Around 5:00 p.m., Officer Higgins observed a vehicle going faster than the speed of traffic and taking a "hard," sharp left turn.  Tr. 5:24-6:2, 7:10-8:15; *see* Tr. 27:20-23, 28:5-16.  Officer Higgins sped up to get behind the vehicle.  Tr. 8:16-9:14; *see* Tr. 28:17-29:25.  Officer Higgins subsequently observed the vehicle roll through a stop sign and activated his emergency lights.  Tr. 5:24-6:8, 9:15-24, 29:21-30:9.

This is a "densely populated residential area" in St. Paul.  Tr. 10:8-9; *see also* Tr. 13:11-15.  As the vehicle was slowing down and in the process of pulling over, Officer Higgins observed the passenger door open slightly.  Tr. 9:25-10:20, 30:16-22.  Once the vehicle stopped, the passenger door opened all the way and an individual subsequently identified as Defendant fled from the vehicle.  Tr. 10:17-11:7, 17:8-21; *see* Tr. 30:16-32:5, 42:25-43:6.

Officer Higgins parked the squad car, exited, and yelled "Stop! Police!" as he began to pursue Defendant.  Ex. 4 at 00:09-14; Tr. 11:8-14.  Officer Higgins pursued Defendant around a home, through the backyard, and into an alley.  Ex. 4 at 00:15-31; *see* Tr. 12:19-13:1, 13:16-22, 33:2-11.  Once in the alley, Officer Higgins heard a single[4] gunshot coming from the direction Defendant was running.  Ex. 4 at 00:29-32; Tr. 14:1-5, 27:9-12; *see* Tr.

---

[4] At the hearing, Officer Higgins testified that, although it sounds like there are multiple shots being fired on the video, it was actually sound distortion from the microphone being close to his mouth while he was yelling.  Tr. 27:1-8.

33:15-23, 34:3-35:12. Officer Higgins drew his service weapon and again yelled for Defendant to stop. Ex. 4 at 00:33-35; Tr. 13:23-14:9, 35:17-23; *cf.* Tr. 33:24-34:2.

Office Higgins saw Defendant stumble and fall as he came down the alley into a more open space alongside a garage, where Defendant was lying on ground. Ex. 4 at 00:33-35; Tr. 14:10-20; *see* Exs. 5, 6; Tr. 32:6-12, 35:13-16, 36:11-15. Officer Higgins called in that shots had been fired and yelled at Defendant, "Where's the gun?" Ex. 4 at 00:36-42; *see also* Tr. 14:25-15:3, 37:1-12. Officer Higgins was pointing his service weapon at Defendant at the time. Tr. 14:25-15:6; Ex. 5; *see* Tr. 36:16-18, 37:9-12. Defendant responded and pointed towards his feet. Ex. 4 at 00:42-43; Tr. 15:18-16:4. Officer Higgins observed two guns in the area to which Defendant had pointed. Tr. 16:5-7, 22-24; *see* Tr. 36:7-10, 19-21.

Officer Higgins ordered Defendant not to touch the guns and to roll over on his stomach, facing away from that area. Ex. 4 at 00:42-59; Tr. 16:3-16. Officer Higgins placed himself between Defendant and the guns. Tr. 18:1-7, 36:22-25. Officer Higgins handcuffed Defendant, began to check him for injuries, and, along with his partner, administered first-aid. Ex. 4 at 1:12-6:36; *see* Tr. 19:21-24, 23:17-24:13. He and others reassured Defendant that emergency personnel were on their way. Ex. 4 at 1:40-6:01. Defendant had a single gunshot wound that went through his stomach and out his back. Ex. 4 at 4:58-5:00; *see* Tr. 19:25-20:20.

In the area by the fence were two guns. Exs. 6, 7; *see* Tr. 20:24-22:1. Officer Higgins directed that the guns be collected and confirmed with Defendant that it was just those two. Ex. 4 at 2:33-34, 6:57-59; *see* Tr. 20:8-12, 21-23, 22:2-10, 24:20-24, 38:7-12.

It was subsequently determined that Defendant shot himself while running away.  *See* Tr. 20:16-20; *see also* Ex. 4 at 3:05-10, Ex. 2 at 11:38-42 (a gun described as "falling").  When one of the guns was being "cleared" by law enforcement, "a spent shell casing was ejected" out of the chamber.  Tr. 22:11-21; *see* Tr. 39:15-24.  Officer Higgins testified that when a semiautomatic gun is fired while being "pushed up against something hard . . . , it will fire the one round, but it will not allow the slide to cycle and eject th[e] round[] that's in the chamber."  Tr. 22:25-23:4; *see also* Tr. 23:11-16, 39:25-40:7, 41:2-42:1.

Office Higgins testified that when law enforcement hears a gunshot, it is considered to be an emergent situation, especially when in the context of pursuing someone who fled from the scene of a traffic stop.  Tr. 16:17-21.  Officer Higgins also testified that a gunshot wound is considered an emergent situation.  Tr. 24:14-16.  Officer Higgins testified that he asked Defendant about the number of guns based not only out of concern for the public given that these events took place in a "very highly populated residential area" but also for the emergency personnel that were on their way to assist.  Tr. 25:3-10.  Officer Higgins testified that he never read Defendant his *Miranda* rights and, once handcuffed, Defendant was considered under arrest and not free to leave.  Tr. 38:13-39:8.

### B.  November 25 & 26 Hospital Interviews

Sergeant Arnold has been with the St. Paul Police Department for over 30 years. Tr. 44:9-11, 73:22-23.  As a member of the homicide unit, he "investigate[s] murders, aggravated assaults and a variety of crimes against persons."  Tr. 44:16-19.  Sergeant Arnold was one of the lead investigators involved in the investigation of this shooting.  Tr. 44:20-22.

5

### 1.  November 25

On the evening of November 25, 2019, around 7:30 p.m., Sergeant Arnold and his partner went to speak with Defendant at the hospital.  Tr. 45:18-24, 63:11-16.  Sergeant Arnold also had a search warrant to collect Defendant's DNA.  Tr. 46:18-20.  Sergeant Arnold and his partner were wearing suits, and their service weapons were tucked under their coats.  Tr. 47:2-11.  Defendant was in the intensive care unit, and Sergeant Arnold asked permission from hospital staff before going in to speak with him.  Tr. 63:3-7, 22-24, 64:17-66:4; *see* Tr. 75:10-22.

Defendant was handcuffed to a hospital bed, but awake and conscious, and agreed to speak with law enforcement.  Tr. 47:25-48:15; *see* Tr. 63:25-64:5, 66:24-67:7.  Sergeant Arnold testified that he "could assume" that Defendant was on some sort of medication but did not know.  Tr. 64:6-16.  Before interviewing Defendant, Sergeant Arnold read Defendant his *Miranda* rights from an advisory form.  Tr. 48:19-21, 67:12-14; Ex. 2 at 7:22-59; *see* Ex. 1.  Defendant acknowledged that he understood his rights.  Ex. 2 at 7:59-8:02.  Defendant was not able to sign the form due to being handcuffed to the bed.  Tr. 48:25-49:6, 67:15-17; *see* Exs. 1, 2 at 8:04-10.  Sergeant Arnold asked Defendant why he ran from the traffic stop.  Tr. 51:4-9; *see* Ex. 2 at 8:44-9:25.  He also asked Defendant about the two guns.  Tr. 51:10-14; *see, e.g.*, Ex. 2 at 9:39-12:39.

Around four minutes into the interview, Defendant told Sergeant Arnold that he was "done talking about it."  Ex. 2 at 12:47-48; *see* Tr. 66:14-23.  Around six minutes later, Defendant asked law enforcement if they could come back another day, such as "tomorrow," because he was in too much pain.  Ex. 2 at 19:08-17; *see* Tr. 66:14-23, 68:25-

69:4, 69:12-15, 76:5-8.  Sergeant Arnold confirmed that Defendant wanted him to come back the next day and Defendant agreed.  Ex. 2 at 19:25-28; *see* Tr. 52:13-19.

Prior to the start of the interview and before they left, Sergeant Arnold and his partner explained to Defendant that members of Defendant's family were trying to figure out how he was doing and offered to assist in relaying information for him.  *See, e.g.*, Ex. 2 at 44:45-5:36, 15:28-16:16, 20:07-20, 21:28-55.  Before leaving, they asked permission if they could tell Defendant's family "that he was okay and what his current status was," and Defendant agreed.  Tr. 52:20-53:5; *see, e.g.*, Ex. 2 at 15:28-16:16; 20:07-20, 21:28-55.  Defendant again indicated that Sergeant Arnold could come back tomorrow.  Tr. 53:16-18; *see* Ex. 2 at 25:47-54.

Sergeant Arnold testified that the tone of the interview was "cordial, friendly."  Tr. 50:3, 68:3-4.  Neither he nor his partner raised his voice, threatened Defendant, or displayed their service weapons.  Tr. 50:4-10.  Sergeant Arnold testified that Defendant made eye contact, responded appropriately, and did not appear to be under the influence during the interview.  Tr. 50:11-51:3.  Sergeant Arnold acknowledged that Defendant did "show[] signs of being in pain on the 25th."  Tr. 75:23-76:4.

Sergeant Arnold made an audio recording of the interview.  Tr. 48:16-18; *see generally* Ex. 2.  At times, there is a significant amount of background noise and shuffling.  *See, e.g.*, Ex. 2 at 00:00-4:27, 5:58-59, 13:09-26, 13:59-14:30, 16:20-24.  Defendant is speaking softly throughout much of the interview.  *See generally* Ex. 2.  Occasionally, Defendant can be heard coughing.  *See, e.g.*, Ex. 2 at 6:08-09, 10:38-39, 12:42-43, 14:44-

45.    Sergeant Arnold and his partner addressed Defendant in a direct, matter-of-fact manner.

### 2. November 26

Sergeant Arnold returned by himself to the hospital the following day around 4:45 p.m.  Tr. 53:21-54:6, 69:16-21.  He was again dressed in a suit, and his service weapon was not visible.  Tr. 56:18-23.  Sergeant Arnold again checked in with hospital staff before going to see Defendant.  Tr. 70:17-71:3; *see* Tr. 75:10-22.

Defendant was still in the intensive care unit but had been moved to another room.  Tr. 72:14-18.  Defendant remained handcuffed to the bed.  Tr. 72:19-23; *see* Tr. 73:3-5.  Sergeant Arnold testified that he asked Defendant "if he was feeling better, and [Defendant] told [Sergeant Arnold] he was feeling much better."  Tr. 70:4-8; *see* Ex. 3 at 00:16-22.  Defendant was awake and responsive, and agreed that he had told Sergeant Arnold that he could come back.  Tr. 55:3-12; *see* Ex. 3 at 1:26-35.  Defendant told Sergeant Arnold that he would tell him what he wanted to know if Sergeant Arnold would tell Defendant what he wanted to know.  Tr. 56:11-17; *see* Ex. 3 at 1:36-42.  Sergeant Arnold reminded Defendant that he had read him his *Miranda* rights yesterday and that those rights still applied, including that Defendant did not have to speak with law enforcement and could ask for an attorney.  Tr. 55:13-20; *see* Ex. 3 at 3:01-11.  He did not reread them.  Tr. 71:8-12.  Defendant confirmed that he understood.  *See* Tr. 55:13-20; Ex. 3 at 3:01-11.

Sergeant Arnold first asked Defendant what he wanted to know, and Defendant asked about the charges he was facing.  Ex. 3 at 3:13-17; *see* Tr. 57:16-21.  Sergeant Arnold

8

explained the charges that had been brought.  *E.g.*, Ex. 3 at 3:18-4:23, 9:18-32; *see* Tr. 57:22-58:10.  Once Defendant heard the charges, he remarked, "So the feds gonna pick that up for sure." Ex. 3 at 3:18-46; *see* Tr. 58:2-4.  Sergeant Arnold and Defendant talked about the possibility of "fed[eral]" involvement in the case and Defendant's criminal history, including felony convictions for "domestic stuff," some of which were "felonies because of prior domestics."  *E.g.*, Ex. 3 at 3:18-4:23, 9:18-32; *see* Tr. 57:22-58:10; *see also* Ex. 3 at 9:52-55 ("See, I've been going to jail my whole life.").  Sergeant Arnold told Defendant that he was "jammed up" on this case, and Defendant agreed. Ex. 3 at 4:47-54; *see* Tr. 58:11-18.  Sergeant Arnold discussed the "extraordinary lengths" the officers had gone to "save his life."  *E.g.*, Ex. 3 at 4:59; *see* Tr. 58:19-59:10.  Defendant acknowledged the efforts of the officers and that they "saved" him.  *E.g.*, Ex. 3 at 5:46-54, 6:05-08; *see* Tr. 59:11-14.  Defendant then proceeded to make incriminating statements regarding the two guns and how he shot himself.  *E.g.*, Ex. 3 at 6:41-8:58; *see* Tr. 59:15-61:8.  Defendant also demonstrated for Sergeant Arnold "how he reached in—reached to his right side with his left hand, and . . . said that when he grabbed the gun that it clicked and went off and that he had shot himself."  Tr. 59:21-24; *see* Ex. 3 at 8:36-57; *see also* Tr. 72:2-7.  Defendant again expressed his appreciation for the officers' efforts. *E.g.*, Ex. 3 at 16:16-30; *see* Tr. 61:9-12.

Sergeant Arnold testified that the tone of the interview was "friendly."  Tr. 56:24-25.  He did not yell, raise his voice, threaten Defendant, or display his service weapon.  Tr. 57:1-6.  Defendant was conscious, spoke in a normal tone of voice, and responded appropriately.  Tr. 57:7-15.

9

Sergeant Arnold made an audio recording of this interview as well.  Tr. 54:7-9; *see generally* Ex. 3.  Like the first recording, there is a significant amount of background noise and shuffling at various points.  *See, e.g.*, Ex. 3 at 00:00-16, 2:25-53, 19:54-21:54.  Defendant's voice is somewhat louder during this second interview, but still soft.  *See generally* Ex. 3.  The exchange between Sergeant Arnold and Defendant was direct, forthright, and respectful.

### 3.  Possible Effects of Medication

Sergeant Arnold additionally testified that, in his 30 years of experience, he had observed individuals who were under the influence of alcohol and narcotics.  Tr. 73:22-74:6.  Sergeant Arnold testified that Defendant did not display any "outward indications" that he was under the influence of narcotic medication, such as slurring his speech or having his eyes dart around, on either day.  Tr. 74:7-15; *see* Tr. 76:14-19, 77:13-19.  Sergeant Arnold further testified that had he observed this sort of behavior, he would have ended the interview and come back another day.  Tr. 74:16-75:9.  Sergeant Arnold agreed that he did not ask Defendant what medications he was taking or what the effects of those medications were. Tr. 76:23-77:4.

### III. CONCLUSIONS OF LAW

Defendant moves for the suppression of the statements he made at or around the time of his arrest and while in the hospital.  Based upon the foregoing findings, the undersigned makes the following conclusions of law.

"The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody."  *United States v. Giboney*,

863 F.3d 1022, 1027 (8th Cir. 2017); *see, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 444-45, (1966). "Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief." *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012).

### A. Statements at or Around the Time of Arrest

Defendant argues that the statements he made "in response to police questions about guns . . . were not preceded by a *Miranda* warning" and therefore "must be suppressed." Def.'s Mem. in Supp. at 7, ECF No. 35. Defendant argues that, at the time the questions were asked, he "was arrested, on the ground, and subdued, so there was no 'emergency.'" Def.'s Mem. in Supp. at 7. According to Defendant, "[a]ny emergency was over the moment he hit the ground" and "was helpless, . . . suffering from a gunshot wound, and immobile." Def.'s Mem. in Supp. at 7. The Government contends that the public-safety exception applies to these statements.

"In [*New York v.*] *Quarles*, the Supreme Court recognized 'a 'public safety exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence.'" *United States v. Watters*, 572 F.3d 479, 482 (8th Cir. 2009) (quoting 467 U.S. 649, 655 (1984)). "Under th[is] exception, a suspect's answers to questions from a police officer are admissible in the absence of a *Miranda* warning so long as the questions asked of the suspect are reasonably prompted by a concern for the public safety." *United States v. Williams*, 181 F.3d 945, 953 (8th Cir. 1999) (quotation omitted). Stated differently, this "exception applies when 'police officers ask questions reasonably prompted by a concern for the public safety.'" *United States v. Liddell*, 517 F.3d 1007,

1009 (8th Cir. 2008) (quoting *Quarles*, 467 U.S. at 656); *accord Watters*, 572 F.3d at 482. "In this context, protection of the public safety includes protection of the police officers themselves." *Liddell*, 517 F.3d at 1009; *accord United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008).

"There can be no doubt that the question[s] posed by . . . [Officer Higgins] w[ere] sufficiently focused on public safety to trigger the public safety exception." *Liddell*, 517 F.3d at 1009 n.2. Officer Higgins asked Defendant where the gun was within seconds of hearing a gunshot come from the direction Defendant was running. Defendant was running through a highly populated, residential area. *Cf. Watters*, 572 F.3d at 482-83. And, Officer Higgins credibly testified that his question was prompted out of concern for public safety and the emergency personnel coming to tend to Defendant's injuries.

The fact that at the time the questions were asked Defendant was already on the ground or later handcuffed does not diminish the concern for public and officer safety. Although Defendant appeared injured, Officer Higgins did not know if the gun was still within Defendant's reach, thereby posing a threat to himself, his fellow officers, the immediate public, and emergency personnel who may soon arrive at the scene. *See Liddell*, 517 F.3d at 1009-10; *Williams*, 181 F.3d at 953-54. Nor was he required to assume that Defendant would "remain nonconfrontational" as he approached. *Everman*, 528 F.3d at 572.

Moreover, the Eighth Circuit Court of Appeals has "recognized that the risk of police officers being injured by the mishandling of unknown firearms . . . provides a sufficient public safety basis to ask a suspect who has been *arrested and secured* whether

there are weapons . . . in a car or apartment that the police are about to search." *Liddell*, 517 F.3d at 1009-10 (emphasis added). Such reasoning applies with equal, if not greater force, to an officer preparing to approach a suspect who, while fleeing from police, appeared to have fired a gun just seconds earlier. *Cf. United States v. Carroll*, 207 F.3d 465, 470-72 (8th Cir. 2000) (public-safety exception would apply to asking robbery suspect, who had fled from and engaged in a shoot-out with police, where he dropped the gun following arrest).

Because Officer Higgins's questions were reasonably prompted by concerns for the safety of the public and his fellow officers in this rapidly evolving, emergent situation, the public-safety exception applies. Accordingly, the Court recommends that Defendant's motion be denied with respect to the statements he made at or around the time of his arrest.

### B. Statements Made at the Hospital

Defendant argues that he did not knowingly and intelligently waive his *Miranda* rights and his statements during the hospital interviews were involuntary. Defendant also argues that Sergeant Arnold was required to reread his *Miranda* rights before the second interview "given the 24-hor interruption." Def.'s Mem. in Supp. at 6.

#### 1. Waiver of *Miranda*

Defendant maintains that "[n]o statement should be taken from a suspect who is hospitalized, in post-operative recovery in an [intensive-care unit], handcuffed to a bed, and hooked up to tubes and monitors, and obviously under the influence of medications." Def.'s Mem. in Supp. at 6.

13

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish the accused 'in fact knowingly and voluntarily waived *[Miranda]* rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Berghuis*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *accord United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). Courts consider the totality of the circumstances in determining whether a waiver is valid, and the Government bears the burden of proving validity by a preponderance of the evidence. *Vinton*, 631 F.3d at 483; *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

"As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protections those rights afford." *Berghuis*, 560 U.S. at 385; *accord United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights."); *United States v. Soto*, No. 07-cr-0223 (PJS/JSM), 2007 WL 3120816, at *13 (D. Minn. Oct. 23, 2007) ("[A] defendant's

willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver."); *United States v. Mandujano*, No. 03-cr-178(2) (JRT/FLN), 2003 WL 22076577, at *4 (D. Minn. Aug. 22, 2003) ("Waiver can be inferred by conduct, and a willingness to answer questions after acknowledging *Miranda* rights is sufficient to constitute an implied waiver."). "Where the [Government] shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384; *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016).

### a. Voluntary

Defendant argues that his "statements were involuntary because he was hospitalized and recovering from surgery, and under the influence of medications." Def.'s Mem. in Supp. at 6.

"A confession is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" *United States v. New*, 491 F.3d 369, 374 (8th Cir. 2007) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *accord Vinton*, 631 F.3d at 482. "In order to determine whether a confession was voluntary, [courts] look to the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (quotation omitted). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *Vinton*, 631 F.3d at 482 (quotation omitted); *accord New*, 491 F.3d at 374 ("Our cases hold that a confession may not be found involuntary absent

some type of coercive activity on the part of law enforcement officials." (quotation omitted)).

While "[s]leeplessness, alcohol use and drug use are relevant to [the] analysis, . . . intoxication and fatigue do not automatically render a confession involuntary." *Gaddy*, 532 F.3d at 788 (quotation omitted). Thus, "[a]lthough [Defendant's] mental acuity is relevant in determining whether his statements were voluntary, it is not dispositive." *Adams*, 820 F.3d at 323-24. Ultimately, "the test is whether these mental impairments caused the defendant's will to be overborne." *Gaddy*, 532 F.3d at 788 (quotation omitted).

Defendant does not assert that Sergeant Arnold engaged in coercive activity. Nor could he. The record reflects that Sergeant Arnold was professional, respectful, and straightforward during each of the interviews, addressing Defendant in a cordial and direct manner. *See United States v. Daniels*, 775 F.3d 1001, 1004 (8th Cir. 2014); *Vinton*, 631 F.3d at 482, 483; *New*, 491 F.3d at 374. The entirety of each encounter was less than 30 minutes. *See Daniels*, 775 F.3d at 1004. Defendant's criminal history also demonstrates that he has a history of interaction with the criminal justice system. "A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary." *Vinton*, 631 F.3d at 481.

As for Defendant's state of recovery and the side effects of his medication, it is more than reasonable to presume that Defendant was on medication at the time of the interviews. He had, after all, suffered a gunshot wound. But, while Defendant argues that he was "*obviously* under the influence of [those] medications," Def.'s Mem. in Supp. at 6

16

(emphasis added), the Court finds credible the testimony of Sergeant Arnold that Defendant was coherent and did not appear to be under the influence of or altered by any medication he may have been taking. *See Gaddy*, 532 F.3d at 788; *New*, 491 F.3d at 374; *see also Vinton*, 631 F.3d at 482. Although Defendant often spoke softly, his responses were rational and appropriate in the context of the questions being asked. *See Daniels*, 775 F.3d at 1005; *Vinton*, 631 F.3d at 482. Further, Sergeant Arnold sought permission from hospital staff each time before he spoke with Defendant. Yet, "[e]ven if . . . [Defendant] ha[d] a somewhat diminished capacity to resist coercion due to a mental defect, . . . a *Miranda* waiver will not be invalidated on that basis if there is no evidence of police coercion." *Vinton*, 631 F.3d at 483. Here, there was none.

### b. Knowing & Intelligent

Defendant further argues that "there could not be a knowing and intelligent waiver of his rights since he was chained to his hospital bed, and suffering and in pain." Def.'s Mem. in Supp. at 6.

It is not enough that the Government "establishes that a *Miranda* warning was given and the accused made an uncoerced statement . . . . The [Government] must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 384. "To make a knowing and intelligent waiver, the defendant must have 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007) (quoting *Moran*, 475 U.S. at 421). Whether a waiver is knowing and intelligent is based on the totality of the circumstances. *Id.* at 990-91.

17

Again, the Court credits Sergeant Arnold's testimony that Defendant was coherent and did not appear to be under the influence of or altered by any medication he may have been taking. Defendant confirmed that he understood his rights each time he spoke with Sergeant Arnold. And, based on his criminal history, Defendant was familiar with the criminal justice system. Defendant did terminate the interview on November 25 due to pain, and Sergeant Arnold testified that Defendant showed signs of pain that day. But, while Defendant was in the hospital recovering from a gunshot wound, the record shows that he understood what was occurring and the rights he was giving up by choosing to answer Sergeant Arnold's questions.

### 2.  Repetition of *Miranda*

Lastly, Defendant argues, without citation to authority, that Sergeant Arnold was "required" to advise him of his *Miranda* rights again before the second interview "given the 24-hour interruption . . . due to [his] inability to carry on a conversation the day before due to pain." Def.'s Mem. in Supp. at 6.

First, as just discussed, the record reflects that Defendant understood what was occurring and the rights he was giving up notwithstanding any pain he was experiencing. Second, the interval of time was approximately 22 hours,[5] and Sergeant Arnold reminded Defendant his *Miranda* rights still applied before the second interview, including that he did not have to speak with law enforcement and could ask for an attorney. "The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to

---

[5] Whether the interval of time was 22 or 24 hours is of no material difference for purposes of this analysis.

remain silent and the right to counsel." *Berghuis*, 560 U.S. at 383. Sergeant Arnold did just that. Moreover, in *United States v. Nguyen*, the Eighth Circuit concluded that a suspect knowingly and voluntarily waived his rights notwithstanding the fact that the *Miranda* warning was given a full day earlier when the suspect was subsequently reminded of those rights during later questioning. 608 F.3d 368, 374-75 (8th Cir. 2010); *see also United States v. Cajas-Maldonado*, 13 F. App'x 469, 475 & n.7 (8th Cir. 2001) (per curiam) (waiver valid more than 7 days later with reminder that rights still applied).

Based on the foregoing, the Court concludes that Defendant waived his *Miranda* rights by responding to Sergeant Arnold's questions after being informed—and subsequently reminded—of his rights, and the waiver was voluntary, knowing, and intelligent.

[Continued on next page.]

19

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements, Admissions, and Answers, ECF No. 24, be **DENIED**.

Date: April\_\_\_27\_\_\_, 2020                    _____*s/ Tony N. Leung*_____
                                   Tony N. Leung
                                   United States Magistrate Judge
                                   District of Minnesota


                                   *United States v. Miller*
                                   Case No. 19-cr-322 (JRT/TNL)

## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.